### In re STANTON.

(Surrogate's Court, Onondaga County. January 24, 1910.)

1. MARRIAGE (§ 11*)—SECOND MARRIAGE—VALIDITY.

Under 2 Rev. St. (1st. Ed.) pt. 2, c. 8, tit. 1, art. 1, § 6, providing that, where any person whose spouse has absented himself or herself for five years without being known to such person to be living shall marry during the life of the absent spouse, the marriage shall be void only from the time that it is annulled by a court, a second marriage by a husband, who abandoned his wife, where the second marriage occurred before the expiration of five years from the time of the abandonment, is invalid from the beginning.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 30; Dec. Dig. § 11.*]

2. MARRIAGE (§ 40*)—VALIDITY—PRESUMPTIONS.

Under 2 Rev. St. (1st. Ed.) pt. 2, c. 8, tit. 1, art. 1, § 5, providing that no second marriage shall be contracted by any person during the lifetime of any former spouse unless the former spouse shall have been finally sentenced to imprisonment for life, the validity of a second marriage by a husband will not be sustained on the presumption that the first wife had been finally sentenced to imprisonment for life, for she will be presumed to have been innocent of crime.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69; Dec. Dig. § 40.*]

3. BASTARDS (§ 3*)—LEGITIMACY—PRESUMPTIONS.

It is the policy of law and the duty of the court to preserve the legitimacy of children, where it can be done consistently with the law and the facts.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. § 3.*]

4. MARRIAGE (§ 40*)—VALIDITY—PRESUMPTIONS—BURDEN OF PROOF.

A husband abandoned his wife, and his whereabouts were unknown for a few years, and, when discovered five or six years later, he lived with another woman as his wife. The first wife acquiesced in the second marriage, and a son of the first marriage recognized the legitimacy of the

---

children of the second marriage. The marriages were contracted more than 60 years ago, and the husband and the two wives had been dead for more than 25 years. *Held,* that the validity of the second marriage was presumed, and the party asserting its invalidity had the burden of proving that the first marriage had not been dissolved.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

Proceedings for the judicial settlement of the account of Maria H. Stanton, as administratrix of George Stanton, deceased. Accounts settled.

Lyman & Canough, for administratrix.

Howard D. Newton, for administratrix of James J. Stanton.

Charles P. Wortman and John J. B. Hickey, for Frank Stanton and Mertie Underwood.

Costello, Burden, Cooney & Walters, for Edward D. Knickerbocker.

GLASS, S. This is a proceeding for the judicial settlement of the accounts of the widow of George Stanton as the administratrix of his estate, and the only controversy in the proceeding is over the question as to who is or who are the next of kin of the decedent entitled as such to take the surplus of his personal estate. The entire surplus is about $6,000.

George Stanton died in 1908, and left no descendants. He and James Stanton were brothers, born of the marriage of John Stanton and Lavinia Cadwell, which took place in Chenango county early in the year 1837. There were no other children of that marriage. George was born in the latter part of the year of his parent's marriage, and James was born about two years later. When James was about six years old, or about the year 1845, when the family were living in Greene in Chenango county, the father, John Stanton, on an occasion when his wife was not at home, packed up some of his household articles, loaded them and his two boys into a wagon, and left his wife and Chenango county, so far as it appears, never to return. The son James he took to a brother of the father who resided at Constantia, in Oswego County, and left him there. James remained with his uncle for a period, the length of which is uncertain, as the evidence stands. It may have been a year, and it may have been five years. His mother, in time having ascertained his whereabouts, went to Constantia and got him, and took him back with her to her home in Norwich, in Chenango county, where she was living with her mother, and where she always lived, at least after the return of her son, down to the time of her death, which occurred in the year 1872. The son James lived with his mother and grandmother up to the time of his marriage. He never saw his father again, and, so far as appears, the father never thereafter concerned himself about the son, who apparently was brought up by the mother and grandmother. The causes which led up to this incident in the life of John Stanton are in no way disclosed by the evidence, but whatever they were he never returned to his wife. It does appear, however, that at one time he did address a letter to his wife, urging a resumption of their relations, but when or from what place

that was written does not appear. Neither does the evidence show the whereabouts of John Stanton for the next few years after leaving his wife. The first reliable information concerning him is that about 1850 or 1851 he was living at Fabius in Onondaga county with Mertia Perry as his wife, and was engaged in the daguerreotype business, and also in selling stoves, traveling about the country, and in the family were also the son George, this decedent, and one or more children by Mertia Perry. His stay in Fabius was for a few years only. He subsequently lived with his family in Spafford and Navarino, in this county, engaged in different kinds of business, such as traveling about selling tinware and burning fluid, and bartering in farm produce. Mertia Perry died at Navarino in 1867, and about 1870 John Stanton removed to Kansas, and remained there until his death in 1884. From this relation with Mertia Perry several children were born, of whom the son Frank and the daughter, Mrs. Underwood, alone survive. The daughter Mrs. Knickerbocker, who died prior to George Stanton, left three children; and it is these two children and three grandchildren who claim to be entitled to share in the distribution of this estate. James Stanton has died since this proceeding was commenced, and his administratrix has been made a party.

The claim is made by the counsel for the James Stanton interest that the marriage of John Stanton with Mertia Perry was bigamous and void, and that the children resulting from that union were illegitimate, and consequently not among the next of kin of their father's legitimate child. There is no serious dispute over the facts, and the determination of the question of legitimacy of the persons mentioned hinges entirely upon the solution of the problem of where the burden of proof lies. The marriage of John Stanton in 1837 to Lavinia Cadwell is undisputed. His marriage 11 years later to Mertia Perry must also be found as a fact in this case. No record has been produced showing any divorce was ever obtained by either John Stanton or Lavinia Cadwell, or showing that their marriage was ever annulled for any reason. It is further proved beyond question that the first wife outlived the second.

It is urged in behalf of the estate of the son James Stanton that the first marriage being established, as well as the further fact that the first wife survived the second, the burden lies upon the other claimants of proving the dissolution of the marriage contract by some court of competent jurisdiction, or at least by proving the existence of such extraneous facts and circumstances as would under the law of this state make the second marriage voidable merely, and not absolutely void.

On the other hand, it is contended by the claimants who are descendants of Mertia Perry that, under the exceptional and unusual circumstances shown to have existed by the proofs in this case, the law from its well-established policy of favoring the legitimacy of offspring, in the interests of society at large, and for the protection of rights of property, as well as by applying the doctrine of the presumption of innocence, will presume that John Stanton did not commit the crime of bigamy by entering into the second marriage, and consequently will presume that in some manner the bonds of the first mar-

riage had been dissolved, and therefore such claimants contend the James Stanton interest must prove that the first marriage has not been dissolved, or that extraneous facts did not exist which made the second marriage voidable. The statute relating to marriage in force during the lifetime of John Stanton and both of his wives, so far as applica-, ble, was as follows (2 Rev. St. [1 St. Ed.] pt. 2, c. 8, tit. 1, art. 1):

"Sec. 5. No second, or other subsequent, marriage, shall be contracted by any person, during the lifetime of any former husband or wife of such person, unless (1) the marriage with such former husband or wife shall have been annulled or dissolved, for some cause other than the adultery of such person; or (2) unless such former husband or wife shall have been finally sentenced to imprisonment for life. Every marriage contracted in violation of the provisions of this section, shall, except in the case provided for in the next section, be absolutely void.

"Sec. 6. If any person whose husband or wife shall have absented himself or herself for a space of five successive years, without being known to such person to be living during that time, shall marry during the life of such absent husband or wife, the marriage shall be void only from the time that its nullity shall be pronounced by a court of competent authority."

If, therefore, the second marriage was entered into by John Stanton without the first marriage having been annulled or dissolved for some cause other than his own adultery, or unless his first wife had been finally sentenced to imprisonment for life, the second marriage was absolutely void, except that, if the first wife had absented herself for five successive years without being known to her husband to be living during that time and the second marriage took place under those conditions, such marriage was valid until set aside by some court of competent jurisdiction.

There can be no claim that the second marriage was voidable merely, and valid until set aside under the provisions of section 6, above quoted, because five years had not elapsed from the time of the separation when John Stanton married Mertia Perry. Neither will there be any presumption that the first wife had been finally sentenced to imprisonment for life, for she will be presumed to have been innocent of crime; so that, unless the law will presume under the facts and circumstances developed in this case that the first marriage contract had been annulled or dissolved when the second one was entered into by John Stanton, the second marriage must be deemed to have been void and the children from it illegitimate. There are some unusual features of the facts in this case which need to be considered in determining the question of where the burden of proof lies. The second marriage of John Stanton occurred 61 years ago. He has been dead 25 years, his first wife 37 years and his second wife 42 years, and the consequent difficulty, if not impossibility, of obtaining evidence from any person having actual knowledge of the facts, is apparent. Livinia Cadwell, the first wife, during the 19 years that her husband and Mertia Perry were living together in Onondaga county as husband and wife, herself lived only 50 or 60 miles distant, and must have known of her husband's manner of living, for it appears that at times the son George went from his father's home in Onondaga county, and visited his mother and brother; and yet, so far as appears, she never repudiated her husband's claim of being the husband of another woman, and never took any steps looking to her own vindication and the enforcement of her

own rights, and those of her son, which it is natural to expect she would have taken if she had considered that her husband had married again without the right to do so. More important perhaps than all is the fact that George Stanton, the decedent himself, as far as appears, always recognized the legitimacy of his father's children of the second marriage, and in every way treated them as his brother and sisters, and even the son James visited his brother Frank in Kansas for a period of three weeks directly after his father's death.

The question presented is by no means easily solved. It has been decided differently in different states, and the uncertainty which exists regarding its proper solution is referred to by Mr. Wigmore in his treatise on Evidence (volume 4, § 2506) in the following language:

"Supposing a party to a marriage to appear to have been a party to a former marriage with another person, the validity of the later marriage will depend upon whether the prior marriage had been in the meantime somehow dissolved, or whether it was itself void; this will raise the question, for example, whether there has been a death or divorce intervening, or whether the other party to the prior marriage was incapable. In thus determining the validity of the later marriage, will one or another of the above facts be presumed to have existed, so as to throw upon the opponent of the latter marriage the burden of producing evidence (or even the risk of nonpersuasion) of the nonexistence of those facts? In issues of bigamy and of legitimacy, there is a special temptation to aid the later marriage. The situation may be additionally complicated by the invocation of the so-called presumption of innocence, and of the presumption of death or of life. Whether the successive shiftings of the burdens should be worked out with mathematical nicety according to the various presumptions applicable or whether all should be merged in a general presumption in favor of the later marriage is a knotty question; and no successful generalization is yet accepted."

In this state the most authoritive decision upon the question is that of the General Term of the Supreme Court, First Department, in 1894 in the Matter of Hamilton, 76 Hun, 208, 27 N. Y. Supp. 813. That was a proceeding brought in the Surrogate's Court of New York county for the probate of a will. A preliminary issue was tried by the surrogate as to whether one Evangeline, who had been cited and had filed objections to the will, was the widow of the testator. It was established to the satisfaction of the surrogate that at the time of her marriage to the testator Evangeline had a husband by a previous marriage living, and the surrogate denied her right to appear in the proceeding. Upon the appeal to the General Term, it was urged that there was no proof that this marriage was existing at the time of the attempted marriage to the testator, and that there was no proof that no divorce or annullment of the pre-existing marriage was had.

Judge Van Brunt said:

"As to the question of the proof that there was no divorce or annullment of any pre-existing marriage, even in a trial for bigamy no such proof is required. The relation once established, it is supposed to continue to exist until something is proved to have dissolved it. And the existence of this marriage between Mann and the contestant having been established, it was incumbent upon her to show that the disability had been removed when she attempted to marry the testator."

There are numerous decisions of the courts of this state following the decision of Clayton v. Wardell, 4 N. Y. 238, where the question of who has the burden of proof in establishing the existence of a

former marriage when the legitimacy of a child by a second marriage is in dispute, in which it has been held that the burden rests upon the party denying its legitimacy. These cases are not in point, because here the existence of the first marriage is conceded; but those authorities are instructive in so far as they disclose the constant desire of the courts to apply the doctrine of presumption of innocence for the purpose of preventing illegitimacy.

In some of the other states the holding is to the contrary.

In Wenning v. Teeple, 144 Ind. 189, 41 N. E. 600, the opinion says:

"It is settled law in this state that, when a marriage has been consummated in accordance with the forms of law, it is presumed that no legal impediments existed to the parties entering into such marriage; and the fact, if shown, that either or both of the parties have been previously married, and that such wife or husband of the first marriage is still living, does not destroy the prima facie legality of the last marriage. The presumption in such case is that the former marriage has been legally dissolved, and the burden of proving that it has not rests upon the party seeking to impeach the last marriage"—citing Boulden v. McIntire, 119 Ind. 574;[1] Teter v. Teter, 101 Ind. 129, 51 Am. Rep. 742; Yates v. Houston, 3 Tex. 433; Dixon v. People, 18 Mich. 84; Harris v. Harris, 8 Ill. App. 57; Town of Greensborough v. Underhill, 12 Vt. 604; Rex v. Twining, 2 B. & Ald. 386; Squire v. State, 46 Ind. 459; Klein v. Laudman, 29 Mo. 259.

In Hunter v. Hunter, 111 Cal. 261, 43 Pac. 756, 31 L. R. A. 411, 52 Am. St. Rep. 180, it is said:

"There is also a presumption, and a very strong one, in favor of the legality of a marriage regularly solemnized. Rather than hold a second marriage invalid and that the parties have committed a crime, or been guilty of immorality, the courts have often indulged in the presumption of death in less than seven years; or, where the absent party was shown to be alive, have allowed a presumption that the absent party has procured a divorce. A more correct statement perhaps would be that the burden is cast upon the party asserting guilt or immorality to prove the negative—that the first marriage had not ended before the second marriage."

I am not prepared to hold such is the law of this state. On the contrary, the decision in the Matter of Hamilton must be considered as furnishing the rule to be followed in all ordinary cases; but, in view of the exceptional and unusual circumstances shown in the case at bar, the remoteness of the transactions in question, the death, long since, of all the parties to the transactions, and the presumable death of all who were witnesses of the transactions, the seeming acquiescence of the wife of the first marriage in the relations which the husband formed with the second wife and the life-long recognition by the intestate himself of the legitimacy of his half brother and sister, I have serious doubts whether the rule laid down in the Hamilton matter should be followed in this case. In the Hamilton matter, the transactions involved were of recent happening; both parties to the marriage there in question were living, and presumably were in possession of information which would make it possible to actually prove whether or not the marriage there in question had ever been annulled, or any divorce granted, and therein in my opinion lies the distinction between the two cases.

As applied to the facts in this proceeding, the rule adopted in Indiana and other states would be far less likely to result in possible justice to

[1] 21 N. E. 445, 12 Am. St. Rep. 453.

the rights of innocent people now living, and to the memory of those now dead, than would the rule in the Hamilton Case; and, upon principle, it seems to me, should be held to be the law of this proceeding.

It is the policy of the law and the duty of the court to preserve the legitimacy of children, if it can do so consistently with the law and the facts, and I feel that that duty requires me to hold upon all the facts proved the law will presume that John Stanton was innocent of the crime of bigamy when he entered into the marriage with Mertia Perry, and will presume that his former marriage with Lavinia Cadwell had in some manner and in some place been dissolved and annulled; and that the burden of showing to the contrary has rested upon the son James and his administratrix. It is not necessary in indulging in the presumption mentioned that any imputation of immorality shall be cast upon Lavinia Cadwell. The annullment presumed need not necessarily be presumed to have taken place in this state, for the court has a right, it is assumed, to take judicial notice of the frequency with which divorces have been obtained in other states upon grounds not reflecting upon the moral character of the parties, under conditions which the courts of this state have recognized as binding in this state. And the presumption that a divorce was obtained at some distant place fully coincides with the prominent fact in this case, that the whereabouts of John Stanton for a period of about five years after the separation from his wife have not been discovered, and still remain a mystery.

For these reasons, a decree should be made directing the distribution of the surplus to the widow and the children of both marriages living at George Stanton's death, or their legal representative, and the children of the deceased daughter, Mrs. Phillips.

The subject of the validity of the contract between George Stanton and his wife has not been discussed by counsel. My present view is that it must be held to be invalid, for the reason that it was not executed by the third party, and will so hold unless counsel shall desire to be further heard on that question, in which case I will hear them upon the entry of the decree, and make such disposition of the question as shall then seem just.

The decree should award costs to all parties who have appeared payable out of the estate. The amounts thereof, respectively, will be determined upon the entry of the decree.

Findings and decree accordingly may be presented upon five days' notice.