(71 Misc. Rep. 620.)

## In re KLINZNER'S WILL.

(Surrogate's Court, New York County. April, 1911.)

1. WILLS (§ 116*)—ATTESTING WITNESSES—COMPETENCY.
   The fact that a witness to a will was a man of evil life, living in illicit relations with the sister of one of the beneficiaries under the will, does not affect his competency as an attesting witness to the will, but merely goes to his credibility.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 284–298; Dec. Dig. § 116.*]

2. WITNESSES (§§ 349, 296, 297*)—CROSS-EXAMINATION—SCOPE.
   A witness may be asked on cross-examination any question which affects his credit by injuring his character, but he need not answer questions tending to convict him of crime or to degrade him.

   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1135, 1021–1037; Dec. Dig. §§ 349, 296, 297.*]

3. WILLS (§ 289*)—EXECUTION—PRESUMPTION OF REGULARITY.
   An attestation clause signed by both the witnesses to a will, stating compliance with all the requirements of the statute, affords some presumption of regularity in the execution of the will.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 653–661; Dec. Dig. § 289.*]

4. WITNESSES (§ 140*)—COMPETENCY—TRANSACTIONS WITH DECEDENT.
   Evidence of the lawyer who drew and supervised the execution of a will is inadmissible on a contest thereof by the heirs to establish due execution, where he is himself a trustee and remainderman under the will, under the statute prohibiting one interested in the outcome of a case to testify to transactions with a decedent.

   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 598–618; Dec. Dig. § 140.*]

5. WILLS (§ 289*)—EXECUTION—PRESUMPTION OF REGULARITY.
   The fact that a lawyer is present and supervises the execution of the will which he has drawn affords some presumption of regularity in the execution.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 653–661; Dec. Dig. § 289.*]

6. WILLS (§ 302*)—EXECUTION—PUBLICATION—EVIDENCE.
   Evidence on a contested application for probate of a will *held* sufficient to show that the contents of the instrument were known to the testator when he published it as his will.

   [Ed. Note.—For other cases, see Wills, Dec. Dig. § 302.*]

7. WILLS (§ 111*)—EXECUTION—SUBSCRIPTION.
   A testator who signs his will by mark sufficiently subscribes it.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 270; Dec. Dig. § 111.*]

8. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE.
   Evidence on a contested application for probate of a will *held* insufficient to show lack of testamentary capacity on the part of the testator.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

Evidence on a contested application for probate of a will *held* insufficient to show that the will was the result of undue influence on the part of any of the beneficiaries thereunder.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

10. WILLS (§ 163*)—UNDUE INFLUENCE—BURDEN OF PROOF.

While the burden of proof is on proponents on all issues as to the factum of the will, a charge of undue influence must be made out in the first instance by those who assert it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

11. WILLS (§ 164*)—UNDUE INFLUENCE—EVIDENCE.

The question whether the provisions of a will are natural and rational on their face may be considered on the issue of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 405; Dec. Dig. § 164.*]

Contested application for the probate of the will of Charles Klinzner. Will admitted to probate.

William W. Southworth, for proponent.

August P. Wagener, for contestants.

James F. Donnelly and J. E. Sheehy, special guardians.

· FOWLER, S. The voluminous testimony taken on the hearing discloses that Charles Klinzner, whose testamentary intentions are the subject of this proceeding, on what proved to be his deathbed, subscribed with his mark the paper now propounded as his will. He was at that time only a few months past 21 years of age. His youth, from an unusually early period, had been dissolute, and he was frequently intoxicated before his final illness; but there is an absence of proof that his use of intoxicants had so undermined his system as to deprive him, when sober, of a "sound and disposing mind." The contestants' counsel conceded on the hearing that it was not claimed by contestants that Charles Klinzner was drunken at the time he affixed his mark to the paper propounded, and the testimony confirms this admission. Thus the extended proofs relative to drunkenness present no serious question concerning the "disposing mind" of Charles Klinzner at the very moment he signed the testamentary paper in question.

Prior to the death of his mother, Charles Klinzner had formed a meretricious relation with Margaret, or "Maggie," Hessler, a young woman in age some years his senior. Her circumstances at that time were as unfortunate as his own. Deserted by her husband (who was at times convict or in prison), and having several young children, this unfortunate woman united her misfortunes with Charles Klinzner's, and after his mother's death made her permanent home in the city of New York, in the tenement owned and possessed by Charles Klinzner and of which he died seized. During the existence of the relations indicated between Charles Klinzner and Margaret Hessler, three children were born to them, two of whom survived Charles Klinzner; and such survivors are mentioned as his children in the paper pro-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pounded as his will. In so far as the testimony discloses, there is no doubt concerning the paternity of these two children; and, with commendable frankness, the counsel for the contestants admitted on the hearing that these children were the very children of Charles Klinzner, thereby relieving me of any responsibility for the consideration of the presumptions which always attach to the birth of children of a woman married de jure to another than her paramour. The presumptions to which I especially refer are of frequent application in the courts of this state: "Semper præsumitur pro legitimatione puerorum." Co. Litt. 126; 5 Rep. 98b; Vowles v. Young, 13 Ves. 145; cited Caujolle v. Ferrié, 23 N. Y. 90, 107; Chamberlayn's Best Ev. 305. Nonintercourse between the mother and her lawful husband must be established in every such case beyond reasonable doubt (Cross v. Cross, 3 Paige, 139, 23 Am. Dec. 778), or else the other maxim, "Pater est quem nuptiæ demonstrant," prevails (Van Aernam v. Van Aernrm, 1 Barb. Ch. 375), even though the spouses live apart. Best, Ev. § 349. While these rules indicated are of general application, they are not without recognized exceptions. Van Aernam v. Van Aernam, supra; Matter of Stanton, 123 N. Y. Supp. 458. For the purposes of this cause, I am relieved from the necessity of considering these established rules, founded on the highest public policy, by the ample admissions of record to the effect that the children named in the paper propounded as the will of Charles Klinzner are his children, and not the children of Frederick Hessler. While these admissions cannot conclude the status of the children themselves, they are sufficient, I think, to explain Charles Klinzner's interest in them and their mention by him in the paper before me for probate.

In so far as their unfortunate circumstances permitted, Charles Klinzner and Margaret Hessler appear to have clothed their unhallowed and unlawful relations with a mask of comparative decency. They certainly cared for their young children, and there is a total absence of proof that their lives were very different in outward appearance or demeanor from those of the respectable dwellers in the tenement where Charles Klinzner for a long time lived and where he ultimately died, as it is claimed, testate. The total absence of proofs of strife, brawling, and outward indecencies in the lives of Charles Klinzner and Margaret Hessler are notable, when we come to consider the contestants' assertions of an undue influence exercised by Margaret Hessler. She seems to have been a quiet woman in her outward behavior, and to have mourned Charles Klinzner when he died with a genuine and exceptional and an unaffected sorrow. From the testimony of several witnesses, notably that of Frieda Strohhaker, to which I attach considerable importance, Charles Klinzner seems on his part to have been constant in his affections for his children and their unhappy mother. No one was heard by me who questioned either his paternal solicitude or his deep interest in the care and maintenance of the woman who stood to them in the acknowledged relation of mother. When we come to consider the issue of undue influence, these facts are not without legal significance. In the catalogue of sins narrated without reserve by the witnesses on the hear-

ing, these negative virtues are fairly entitled to stand out to the credit of Charles Klinzner and the woman who was the mother of his children and who is here claimed to have successfully exerted a scheme of influence which vitiates the paper propounded as a will. In the course of the extended hearing in this proceeding, some reliance upon both sides seems to have been placed on the fact of Charles Klinzner's connection with the divorce proceedings of Margaret Hessler from the lawful husband who had deserted her, and it is apparent from the testimony that Klinzner had some intention of ultimately making Margaret Hessler his own lawful wife when her divorce was obtained. Had he lived to fulfill his intentions and then died, the contestants in this matter would have been in a more unfavorable position than they now occupy; for, if the recently adopted although ancient rule, "legitimatio per subsequens matrimonium," applies to issue born under the circumstances attaching to Charles Klinzner and Margaret Hessler—a question on which I have doubt—then their prior issue would have been in this state legitimated by such subsequent marriage of their parents, and the only heirs at law and next of kin of Charles Klinzner would have been the children named in the paper propounded. In such an event the contestants here would have thereafter no standing in a proceeding of this character, and they need not be cited in the ordinary course of procedure on the will of Charles Klinzner. With this brief review of what I esteem to be the leading facts established in this cause, in so far as they concern the relations existing between Charles Klinzner and the principal beneficiaries under the paper propounded as his will, we may pass to the preliminary inquiry of a court of probate, the factum of the will.

On the 28th day of April, 1910, Charles Klinzner, who was then on his bed of death in the home in the city and county of New York occupied by himself, Margaret Hessler, and their two children, made the paper here propounded. A respectable physician, Dr. Steffens, was then in attendance on Charles Klinzner. From his speech I judge Dr. Steffens to be a native of some Germanic country. He was a dignified man of obvious intelligence and education. On the 27th day of April, 1910, it was he who suggested in substance that the household should prepare for the worst, and that Charles Klinzner "should make a will now," and "not wait any longer—that the man was dying." Here was no suggestion from Margaret Hessler. On the contrary, the physician, who was a stranger to her and the children, a man entirely disinterested and with no apparent motive, appears to have suggested the propriety of a will to the patient. At this time those whom the law regarded as the heirs at law and next of kin of Charles Klinzner were a paternal uncle and some cousins residing in Germany, besides several maternal aunts and cousins, most of whom lived at a great distance from Charles Klinzner. There is no proof that Charles Klinzner had any intercourse with any of these blood relations, except his aunt, Mrs. Mehnken, who resided in Brooklyn, N. Y. Even with her, after the death of his mother, the intercourse appears slight, and not altogether of an affectionate character. This

aunt proved herself to be an austere and respectable person, whose nephew Charles was recalcitrant. They had little in common.

The estate purporting to pass under the testamentary paper propounded was the tenement property in which Charles Klinzner died and a bond and mortgage for $1,000. The tenement property was conceded to be worth $15,000. Thus, $16,000 is the aggregate of the property passing under the will of Charles Klinzner. It was derived by testator from his father, when Charles Klinzner himself was an infant. His guardian, Herbert Peake, known in the testimony as "Lawyer Peake," seems to have handed the property over to his ward in due course; and this guardian it was who was called upon by Charles Klinzner to prepare the instrument which is now the subject of our consideration. Charles Klinzner does not appear to have been a wasteful person; and his income during life, whatever it was, appears to have been sufficient for the modest needs of himself, Margaret Hessler, and their young children. Such was the situation when the testamentary paper in controversy came into existence.

At the time of the signing and subsigning of the paper propounded, there were present in the small bedchamber of Charles Klinzner "Lawyer Peake," Dr. Steffens, Otto J. Wissler, Margaret Hessler, and Charles Klinzner, then confined to his bed. "Lawyer Peake" had prepared the will, and he superintended its execution. The physician and Wissler were the attesting witnesses. Margaret Hessler seems to have been an occasional bystander during the act of testamentation, but there is no direct evidence that she did or said anything on the occasion of the execution in question. There is no doubt that Charles Klinzner was then mortally ill and feeble physically by reason of his malady, a hasty consumption, which, on the next day, caused his death.

Of the attesting witnesses Dr. Steffens, the attending physician, was a professional man of unimpeached character. To his testimony I attach great weight.

[1] Otto Wissler, the other attesting witness, is claimed by contestants to have been a man living in evil intercourse with the sister of Margaret Hessler; and I think that the indignation of contestants at such relations is not on this point feigned. But even an evil liver is not now incompetent to act as a witness to a will. Evidence on that point goes only to his credibility. It no longer deprives him of capacity to act as an attesting witness. In the Roman law an infamous person, or one convicted of the offense charged (I cannot say proved) against Wissler, had not capacity to act as a witness to a will. Infamy of a witness then went to his capacity, and want of capacity in a witness rendered a Roman will inofficious. J. 2, 10, 6; D. 22, 5, 14. The early ecclesiastical law of England was probably the same on this point. Ayliffe seems to indicate as much. Parergon Juris Cononici Anglicani, 536; and see Proctor's Practice in Ecclesiastical Courts (Dublin, 1798), 138. Even after the statute of frauds requiring "credible witnesses" to a will a person convicted of crime was incompetent as a witness to a will. Pendock v. Mackinder, 4 Burns' Ecc. Law, 122. But this rule was taken away in England by 31 St. Geo.

III, c. 35, and in this state by the Revised Statutes (2 R. S. [1st Ed.] 701, § 23) and the Code of Civil Procedure (section 832). So that at the present time even an infamous person in the common-law sense of that term is not incapable in this state of being a witness to a will. Otto Wissler was not an "infamous person" in the sense indicated. He was not a convict. His faults and misdeeds, if provable or proved, go simply to his credibility as a witness. In fact, he did not admit on cross-examination the charge in question; and, while it is possible that he might have been asked on cross-examination the direct question (see People v. Blakeley, 4 Parker, Cr. R. 176; overruled La Beau v. People, 6 Parker, Cr. R. 371), he could in any event have claimed privilege, or, if he had denied the charge, he could not have been contradicted. Potter v. Browne, 197 N. Y. 288, 293, 90 N. E. 812.

[2] It is a general rule of evidence in common-law courts that a witness on cross-examination may be asked any question which shakes his credit by injuring his character, as the answer may affect the weight of his testimony. Of course, he is not bound to answer questions tending to convict him of crime or to degrade him. In this state the Court of Appeals has said on several occasions that the witness need not answer even questions which tend to disgrace him. The line of authority in different courts is, on this point, somewhat inconsistent at present. In England there is a statute which provides that no witness is liable to be asked any question tending to show that he has been guilty of adultery. 32 & 33 Vict. c. 68, § 3. But under general principles such a question is improper in this jurisdiction. As the objectionable testimony has erroneously been allowed to creep into this cause, I am bound to consider somewhat its general effect. Whether the bad character of a witness to a will may not sometimes be considered in a testamentary cause may be a serious question. In his subsequent appearance on the stand such a witness appears in a distinct capacity. "Testamenti factio, non privati, sed publici juris est." An attesting witness to a will occupies a quasi public status. He is there to see the law obeyed. He is allowed to give his opinion at large on the testator's mental competency to perform the act of testamentation. That the character and standing of such a witness is always a collateral matter in a testamentary cause may be open to doubt. But, passing this point without final consideration at this time, it certainly appears in the record that attesting witness Otto Wissler's life was irregular; and I therefore consider its legal effect on the testimony of this particular subscribing witness, as my so doing will not prejudice the proponents in the conclusion to which I feel constrained to arrive in this cause. Excluding the effect of such evidence altogether might, on the other hand, occasion some prejudice to contestants, as the evidence was several times received without and over objections. In my consideration of this evidence I do so in order not to prejudice contestants by excluding its consideration. They at least cannot complain of the testimony on this point, for it was given at their own instance.

As the law stands, the fact that Otto Wissler, the attesting witness

of Charles Klinzner's will, may have been an evil liver, or even infamous at common law, goes only to his credibility as a witness. It does not longer disqualify him as a witness to the will, although it may be considered on the final hearing of the cause. 3 Phill. 370. Otto Wissler had been long intimate with Charles Klinzner, and it is apparent entertained for him a genuine regard. He was on the spot before the paper propounded was executed. He was an attesting witness, and his testimony as to what took place accords with the testimony of Dr. Steffens, the other attesting witness. It bears all the evidence of inherent probability; and, in so far as it accords with the evidence of Dr. Steffens, I must in any event give to it the ordinary legal effect of other testimony taken under oath. The formal execution of the testamentary paper propounded took place in the little room in which Charles Klinzner lay sick and on the day preceding his death, which is the day the writing bears date. The actors in the transaction were all grouped in close proximity—the presence of all was an actual, not a constructive, presence. The unity of the transaction is complete; that is, all the acts required to be done by the statute of wills in the execution of a will were performed on one occasion, without interruption. This is sufficient proof of order. Jackson v. Jackson, 39 N. Y. 159. Further, there is evidence of a subscription by the testator at the end of the will in the presence of two attesting witnesses, and of a declaration or publication of the instrument by or on the part of the testator. The attesting witnesses acted as such at testator's request, and they signed after the testator and in his actual presence and in the presence of each other. Such, I think, is the effect of the testimony of Dr. Steffens, and the testimony of Mr. Wissler on this point is in substantial accord.

[3] Besides this, we have annexed to the testamentary paper at issue a certificate of attestation in due form, certifying to a compliance with the statute of wills in all respects. This certificate is signed by both attesting witnesses. It affords some presumption of regularity in the execution of the paper before me. Matter of Cottrell, 95 N. Y. 329.

[4] In addition, we have the presence on the occasion of the testamentary act of a lawyer, Mr. Peake, who, unfortunately, had to some extent permitted himself to be written in the will as remainderman in the event that either of the children of Charles Klinzner should die under 21 years of age. Even if Mr. Peake was rendered otherwise competent as a witness by being called for the executor, his interest, in my judgment, excluded his evidence of execution, unless the objection were waived. It was claimed by proponents that Mr. Peake's interest was contingent, and that he was not thereby disqualified as a witness. It seems to me that his interest under the will was sufficiently certain to disqualify him. My opinion was that when Mr. Peake, the executor, trustee, and remainderman under the will, offered himself as a witness in his own behalf in a proceeding to establish the will against the heirs at law and next of kin, it was the same as if he were claiming in ejectment under a deed made as a donatio causa mortis against an heir at law in possession. In such an

action the grantee would be a party in the case, and he could not testify to transactions with the deceased donor over the objection of the heir at law. Mr. Peake was not only an executor. He was a trustee and a beneficiary under the testamentary instrument in question, and I think he was disqualified as a witness to a transaction with the deceased. If he had been a mere executor, the case would be different, very different, from this. I did not think the cases cited by the proponents' counsel on the contingent character of the witness' interest under the will in point. Matter of Smith, 95 N. Y. 526; Wallace v. Strauss, 113 N. Y. 238, 21 N. E. 66. I therefore excluded his testimony. Whether I judged rightly in this course or not, the contestants cannot complain, as the testimony was excluded on their motion.

[5] We have, however, in evidence the undisputed fact that Mr. Peake, the former guardian of Charles Klinzner and a counselor at law of this state, was present at the time of the execution of the instrument propounded as a will. This presence in itself, like the certificate of attestation annexed to the will, affords some presumption of regularity in the execution of a will. Matter of Cottrell, 95 N. Y. 329, 339. A lawyer is generally present for the purpose of superintending the execution of a testamentary instrument, and in order to see that the acts required by the statute of wills are severally performed. Matter of Nelson, 141 N. Y. 152, 36 N. E. 3; Matter of Foley, 55 Misc. Rep. 162, 106 N. Y. Supp. 474.

[6] But two points, as I understand it, are urged against the sufficiency of the execution of the instrument propounded. One is that there is no sufficient evidence of publication by the testator, in that, as he was "ill and languishing," the contents of the paper should have been brought home to him with more particularity than the proofs disclosed, or else that there could be in law no sufficient publication of this particular will. At least, such I esteem to be the nature of the contestants' objection, that there is no proof that this particular will was read to Charles Klinzner before its subscription and publication by him. Certainly, if this intending testator did not know the contents of the testamentary paper presented to him for his signature, animus testandi, or publication, is not established in this cause. Publication under the statute of wills in force is, doubtless, become the supreme evidence of animus testandi. If the contents of a particular paper are unknown to one "sick and languishing," how can he be said to publish that paper as and for his last will and testament? Matter of Moore, 109 App. Div. 764, 765, 96 N. Y. Supp. 729; Rollwagen v. Rollwagen, 63 N. Y. 504, 517. The force of contestants' objection on this point in the abstract is, I think, apparent. But the question here is, Is this objection well founded in fact? Certainly, if, as is claimed, there is no evidence that Charles Klinzner knew the contents of the paper in question, there is, on the other hand, no evidence to the effect that he did not know its contents. One of the attesting witnesses, Otto Wissler, testifies that the will was read to Charles Klinzner. Dr. Steffens simply testifies that it was not read while he was present. Here is no inconsistency. Otto Wissler was with Charles Klinzner the whole of the day during which the paper in question

was signed. Dr. Steffens came for his professional visit and tarried only for the execution of the paper. If we disregard Wissler's testimony on this point, which I think I cannot do, we still have the presumption of publication in favor of the will. Mr. Peake was present all the time before Dr. Steffens came. If a presumption of regularity of execution is afforded by the mere presence of the lawyer charged with such execution, does such presumption stop short of publication or of the inclusive presumption that the contents of the particular will were made known to the testator? I think not. See 1 Jarman, Wills (4 Am. Ed.) 47; Harrison v. Rowan, 3 Wash. C. C. 580, 584, 585, Fed. Cas. No. 6,141. It is true that there can be no presumption based on another presumption. But that rule is not violated by an inference that this will was read to the intending testator. That the lawyer in attendance should read the contents of the testamentary instrument to Charles Klinzner was a natural thing to do. Doubtless the will was read to the intending testator, as Wissler testifies, and therefore we need not rest on presumption alone. If Mr. Herbert Peake, the lawyer in attendance, had, on the occasion, acted as an attesting witness, he could have enlightened us on this precise point. Matter of Sears, 33 Misc. Rep. 141, 68 N. Y. Supp. 363. I cannot allow the fact that he inadvertently (I do not say improperly) wrote himself into the will to jeopardize the interests of helpless offspring of Charles Klinzner, if, in any view of the case, the law permits me to presume that Mr. Peake acted on the occasion as other lawyers act on a similar occasion. I believe the law compels me in any event to presume for the will; and I therefore find that publication has been sufficiently made out by proponents, even if the actual proofs fall short, which I do not believe they do. Worthington v. Klemm, 144 Mass. 167, 10 N. E. 522.

[7] The second point urged by the contestants against the alleged will is the sufficiency of the testator's subscription thereto. Being physically too feeble to complete his signature, for he could write, Charles Klinzner asked, in substance, if a mark or cross would do instead of his signature, and then he made a cross for his subscription. About the mark "Lawyer Peake" wrote the words, "Charles Klinzner, his mark." Under the old statute of wills, as amended by the statute of frauds, which required that the intended will should be signed by testator, a mark was always held a sufficient signing, even if a testator could write (Harrison v. Harrison, 8 Ves. 185; Addy v. Grix, Id. 504; Lemayne v. Stanley, 3 Lev. 1; 4 Burns' Ecc. Law, 103); and this was undoubtedly the law of this state prior to the existing statute of wills. Mr. Jarman, in an early edition of his admirable work on Wills, so frequently approved by the highest courts of this state, has some sensible observations on cases where a testator may be too sick even to make his mark. He assumes the validity of such a subscription. That the law in this state has not been changed on this point by the present statute of wills is apparent. Chaffee v. Baptist Missionary Soc., 10 Paige, 85, 40 Am. Dec. 225; Butler v. Benson, 1 Barb. 526, 533; Jackson v. Jackson, 39 N. Y. 153, 159; Matter of Foley, 55 Misc. Rep. 162, 106 N. Y. Supp. 474; Matter of Simpson, 2 Redf.

Sur. 29; Hartwell v. McMaster, 4 Redf. Sur. 389. I hold, therefore, that Charles Klinzner sufficiently subscribed this will under the statute of wills now in force. Here is not the case of Knapp v. Reilly, 3 Dem. 427. In the present instance it is in evidence that the intending testator himself made his mark, being too feeble to write his name. To every intent the mark in question was a testator's subscription within the existing statute of wills.

[8] The next point urged against the probate of the paper before me goes to the testator's mental competency at the time of the execution of the paper propounded. It is claimed that Charles Klinzner had not at the time he subscribed his will a "sound and disposing mind"; or in other words, that he was non compos mentis and incapable. On this point the evidence of Dr. Steffens, the attending physician of Charles Klinzner as well as a subscribing witness to the will, is, I think, controlling. The time which is pertinent for us to consider on this point is the very moment of the execution of the testamentary paper. At that moment Dr. Steffens and the other attesting witness were with Charles Klinzner, and no other witness was then present, except two whose mouths were sealed by reason of interest and disabilities. It seems to me that Dr. Steffens' testimony on this point is final. It is, however, to some extent corroborated by the testimony of another physician, Dr. Clark, called in the night of the day the will was made to attend Charles Klinzner. Dr. Clark states that Charles Klinzner was then very sick, but that his answers to questions were coherent and intelligent. He confirms the nature of the malady afflicting Charles Klinzner, and states that it was tuberculosis, which in common speech is consumption. On all points of this sort the testimony of the two medical men is in accord, and they are the most competent witnesses on this point in this cause. It is true that it is in evidence that Charles Klinzner was addicted to drink, but I look in vain for any testimony which proves that in his hours or days of sobriety Charles Klinzner lacked possession of his ordinary mental faculties. When not drunken, even a habitual drunkard may make his will. Peck v. Cary, 27 N. Y. 9, 84 Am. Dec. 220. The proofs show that at the moment of making the will Charles Klinzner was sober. He had then been ill for weeks, and there is no proof that during this season of illness he had taken stimulants which deprived him of mental capacity at the moment of his making the testament in question. How far drink may have weakened his mental faculties I shall reserve for final consideration under the allegation of undue influence. In my opinion contestants have not attempted to make out that Charles Klinzner was incapable of making his will by vicious and voluntary drink. On the contrary, the record discloses that contestants do not so claim.

The force of the medical testimony substantiating Charles Klinzner's capacity to make this will under consideration is attempted to be neutralized by the contestants in two modes: First, by the testimony of lay witnesses to acts and conduct of Charles Klinzner in their opinion irrational; second, by inconsistent statements of Dr. Steffens and admissions by Margaret Hessler, a beneficiary under the will.

I shall consider the effect of this evidence in the order stated. The testimony of the lay witnesses is founded on acts and conduct of Charles Klinzner at a different moment from the act of testamentation. The acts in question are in substance mumbling to himself, staring in one direction, a nervous trembling or twitching of the muscles, silence when interrogated by curious visitors, and other like acts. The witnesses to this point were neighbors or simple acquaintances, and their presence in the sick room friendly inquisitiveness. Their observations, or their means of observation, were limited, and not of the best. They interpreted the negative acts of the sick and dying man differently from his physician. Nervous tremors, fixed eyes, a desire for silence, would seem to be characteristic of a serious malady and of so dreadful a moment as that in which Charles Klinzner then was. Giving full effect to this lay evidence, it does not in my judgment meet or overcome the positive and competent evidence furnished by the testimony of the attending physicians.

The testimony of witnesses may no doubt be impeached by their statements out of court. 3 Redf. Wills, 45. In regard to the admissions claimed to have been made by Margaret Hessler, they were, even if competent against herself, which I doubt (Matter of Kennedy, 167 N. Y. 163, 60 N. E. 442), certainly incompetent against the children named in the will. She herself distinctly denied having made these admissions. On an issue of this character the surrogate is enjoined to be liberal in the reception of evidence, and the door is to be widely opened. Matter of Woodward, 167 N. Y. 31, 60 N. E. 233. The range of the evidence on issues of sanity and undue influence in testamentary causes is necessarily great. If evidence is wrongfully excluded, the exclusion may be prejudicial. If included, it cannot be harmful if there is competent evidence on the same point. It is under the authorities only when the surrogate excludes competent evidence and there is no other evidence on that point, or when he includes incompetent evidence where there is no competent evidence, that a surrogate's ruling on evidence is now such error as affects the result. I have endeavored to apply the existing rules of evidence in this cause. If I have erred, I am satisfied that no prejudice was thereby occasioned to the contestants, for with them I was most liberal. Code Civ. Proc. § 2545. The strict and wise rules of evidence formerly enforced at nisi prius, and now at jury sessions, are conceded by high authorities to have little relation either to courts of probate or to courts of equity. Such rules are in the main the outgrowth of the jury system, and are in origin associated with the original writs and the formulary types of action once employed in the common-law courts, both civil and criminal. In courts of probate such rules have less force from the very nature of things. The chief actor in these courts is always one silenced by death. His declarations are often the only evidence of his part in the very matter under investigation. To exclude such declarations is to throw the investigation into hopeless obscurity. "Hearsay" is not always incompetent. Indeed, in countries where the civil law prevails, it is nearly always admissible, but subject to rules which make its importance as evidence conform to the standards of scientific ac-

curacy. For hundreds of years no judgment of a court of probate appears to have been disturbed by reason of errors in the reception of evidence, or by reason of violation of evidentiary rules alone. But then the system of pleading precluded error in such direction. The present practice in probate courts is entirely modern. It is the present practice alone which is no doubt binding on me; and, in so far as I have been able, I have given it all the effect in this cause which the law, as I understand it, imposes. The admissions or declarations of Margaret Hessler against her interest, if really made, which she denies under oath, I regard as inconsequential, as other competent testimony on all the issues before me was received and is controlling.

The statements of Dr. Steffens, contrary to his evidence, are claimed to have been made to one of the contestants, the respectable maternal aunt of Charles Klinzner. Post litem motam, this lady visited Dr. Steffens with her nephew, who was no relative of Charles Klinzner, as a witness for her. The nephew spoke no German, and the conversation between Dr. Steffens and Mrs. Mehnken was partly in German and partly in English. I am inclined to believe that Dr. Steffens' language was not precisely understood by the lady, and that he did not then mean to contradict or control his testimony given subsequently under oath. We must remember that Dr. Steffens was not bound to state to his strange interlocutors the mental condition of Charles Klinzner, or the circumstances surrounding his patient's will. If anything, his obligation was otherwise and his duty to conceal the facts. I would not give much effect to post litem admissions or statements, made to a litigant, contrary to duty, and under such circumstances as those surrounding the statements claimed to have been made by Dr. Steffens.

But, even if I misinterpret the position of Dr. Steffens, what can be said of the litigant who testifies to the contradictory statements of Dr. Steffens? She was distinctly a party in interest, the active opponent of the will under consideration. She knew presumably the force of Dr. Steffens' testimony, if favorable to the will. She visits him, armed with a witness, interrogates him, and then interprets his replies. Where do interest and interpretation stand on such an issue? It is true that interest no longer excludes a witness. It is not true that interest plays no longer a part in rules regulating the weight of evidence. This is shown by the most recent cases selected at random. Berkowitz v. Schlanger, 70 Misc. Rep. 239, 126 N. Y. Supp. 664; Rheinfeldt v. Dahlman, 19 Misc. Rep. 162, 43 N. Y. Supp. 281. It was an old rule of the ecclesiastical courts to view the deductions of witnesses from facts with suspicion. Dillon v. Dillon, 3 Curt. 86. Presumably this was formerly the rule in the courts of the surrogates. Bias or interest of the witness is always considered in such a connection. Mrs. Mehnken wishes to break the will of her nephew. She has both an interest and a bias to interpret the conversation of Dr. Steffens in a way not unfavorable to herself. In such a case it is material for the court to consider what support her evidence has. Cartwright v. Cartwright, 1 Phill. 90. This I have done; and, under all the circumstances, I am inclined to think that there is nothing in the testi-

mony of Mrs. Mehnken which impeaches the testimony under oath of Dr. Steffens.

[9] I come now to the consideration of the contestants' charge of undue influence exerted by some one over Charles Klinzner. The contestants' formal objection on this point specifies no one in particular as exerting the undue influence in question, and no point of this omission was made by proponents. Yet I take it as a rule of pleading that, where fraud is charged, there must always be a definite actor charged with the unlawful acts constituting such fraud. Undue influence is but a species of fraud. Matter of Smith, 95 N. Y. 516, 522. The objection in this cause, in the absence of averment, must be intended to refer to the beneficiaries under the will, and so I construe it. These beneficiaries are the infants (whose tender inefficiency shows want of all participation in fraud), Margaret Hessler, and the lawyer, Mr. Peake. The charge of undue influence obviously must be confined to the latter adult persons. It is their undue influence which is intended by the objection in question. Now, where is the proof that Margaret Hessler unduly influenced the testator to make this particular will? Undue influence is such an influence as deprives the testator of the free exercise of his intellectual powers. Heath v. Koch, 74 App. Div. 398, 77 N. Y. Supp. 605; Gardiner v. Gardiner, 34 N. Y. 155. Undue influence is sometimes alluded to as "force" or "coercion." Matter of Martin, 98 N. Y. 196. Undue influence imports that the mind of the maker of the will is in subjection to some other mind. In other words, the testator's disposing mind is in prison, as it were, and some one else is then in control of his disposing mind. A great variety of circumstances may contribute to produce undue influence, but no good purpose is subserved by our consideration at length of a subject so often and so exhaustively defined by the highest courts of the land. It will suffice to point out that in this cause there is an absence of proof that at the time of making the instrument under consideration Charles Klinzner's mind was under the domination or control of any of the persons benefited by its provisions or by any other person soever. That the mind of Charles Klinzner was affected by the drink habit was not proved on the hearing, or, I think, attempted to be proved. In fact, no apparent connection was made out between such habit and Charles Klinzner's mental condition on the day he made his will. Neither medical man was interrogated on this point. I cannot infer evil consequences from deplorable habits.

[10] While the onus probandi in testamentary causes is frequently said to remain with proponents on all issues relating to the factum of a will, a charge of undue influence by contestants must be made out in this jurisdiction in the first instance by those who affirm it. Matter of Martin, 98 N. Y. 196; Matter of Bolles, 37 Misc. Rep. 567, 75 N. Y. Supp. 1062; Matter of Nelson, 97 App. Div. 217, 89 N. Y. Supp. 865. I have searched the proofs in this cause for any adequate evidence tending to show any undue influence exerted over Charles Klinzner by any person concerned. The lawyer who wrote himself into the will did so in such a remote manner as to raise no presumption against the prior legatees or devisees named in the will. Even if the

burden was on the lawyer to establish the fairness of the instrument propounded, that burden is, I think, discharged in this cause. In fact, I find no evidence which would justify me in concluding that at the time Charles Klinzner made his will he was not a free agent and in full possession of a disposing mind.

[11] As said in Matter of Martin, 98 N. Y. 197, "The will is rational on its face." That the contents of a testamentary paper may in this jurisdiction be looked into for evidence on an issue of undue influence has I think been established. Matter of Budlong, 126 N. Y. 423, 27 N. E. 945; Roche v. Nason, 185 N. Y. 140, 77 N. E. 1007. If we look at the contents of the paper purporting to be the will of Charles Klinzner, the provisions for those conceded to be the children of the testator are natural and "rational on their face." That he should provide also for their unfortunate mother, who had been the companion of his later life, was a humane dictate which certainly does not import irrationality. The testator must be assumed to know that, if he had not provided for the unfortunate children for whose very existence he had a tremendous responsibility, they might now be a county charge. It would seem that the will in question accords with the natural obligations of this particular testator, and that it was such a reparation as a man in his serious situation, on the eve of dissolution, would surely make to those he had assumed to provide for in life. In the will itself I detect nothing unnatural or "irrational on its face."

To the contestants' argument that this will overlooks those whom the law made the testator's heirs and next of kin, and gives his patrimony to his unfortunate consort and their unfortunate children, little attention is, I think, due in this particular cause. Charles Klinzner's situation was exceptional. His life was abnormal, and passed far from those the law made his heirs and legal kindred. His will is in precise accordance with the tenor of the testator's entire life. The law does not permit me to set aside the will of the erring as a punishment for their moral errors. A surrogate has no such extended jurisdiction.

In view of the facts established in this proceeding, I feel constrained to pronounce for the will. My sentence, therefore, is that the paper writing propounded as the will of Charles Klinzner, deceased, is entitled to probate as the will of real and personal property of Charles Klinzner, deceased. Let such a decision and decree be submitted to me for my signature. The proponents and the guardians of the infants are entitled to costs out of the estate. I impose no further costs in this proceeding.

Decreed accordingly.