(97 App. Div. 212.)

In re NELSON'S WILL.

(Supreme Court, Appellate Division, Second Department.   September 29, 1904.)

1. WILLS—VALIDITY—UNDUE INFLUENCE—BURDEN OF PROOF.

On an application for the probate of a will the burden of proof that the will was induced by undue influence amounting to fraud or coercion is on the contestant.

2. SAME—TESTAMENTARY CAPACITY—UNDUE INFLUENCE—EVIDENCE.

In proceedings for the probate of a will evidence *held* insufficient to show either want of testamentary capacity or coercion amounting to undue influence.

Appeal from Surrogate's Court, Kings County.

Application for the probate of the last will of Samuel Nelson, deceased.   From a surrogate's decree refusing probate, proponent appeals.   Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Jacob Manheim, for appellants.

Louis B. Boudin, for respondent.

WOODWARD, J.   Jacob Nelson, as the administrator appointed by the will of the late Samuel Nelson, of the borough of Brooklyn, offered said last will and testament for probate before the surrogate of Kings county, and upon the objections of Sarah Nelson, widow of the deceased, this will has been denied probate.   The decree adjudges "that the said instrument in writing purporting to be the last will and testament of the said Samuel Nelson, deceased, was not executed and attested in the manner prescribed by law for the execution and attestation of last wills and testaments; and that the said Samuel Nelson, at the time of the alleged execution of said instrument, was not competent to execute the same; and that the execution thereof by him was procured by fraud and device; and that the said instrument in writing is null and void as for the last will and testament of the said Samuel Nelson, deceased, and that the same be, and it hereby is, refused probate."   The proponent appeals from this decree.

After a careful reading of the evidence in this matter, we are unable to understand how the learned court reached the conclusion that there was anything amounting to fraud, collusion, or improper influence in the making and execution of this will.   The will is somewhat crude, being drawn by a notary public and real estate dealer; but we fail to find any lack of the formalities prescribed by the statutes.   It recites that "I, Samuel Nelson, being of sound and disposing mind and memory, and considering the uncertainty of this life, do make, publish and declare this to be my last will and testament as follows, hereby revoking all other and former wills by me at any time made."   He then provides for the payment of his debts; gives to his sister Rose Nelson $400, to his sister Mamie Marcus Nelson $150, to his sister Loie Nelson $250, to his brother Jock Nelson his business as a confectioner

and dealer in cigars, and to his ·wife an insurance policy in the Metropolitan Life Insurance Company for $1,000. He then makes his brother Jock Nelson his executor, and signs the paper at the end of his will, and Abraham Schlar and Charles Bavetta sign the same as witnesses, it being recited that the same was "subscribed by the testator named in the foregoing will, in the presence of each of us, and at the time of making such subscription the above instrument was declared by the said testator to be his last will and testament, and each of us, at the request of said testator, and in his presence and in the presence of each other, signed our names as witnesses thereto." Upon the hearing of the objections both of the subscribing witnesses were present, and testified to the execution of the will in accord with the above declaration, and this testimony was not disputed or weakened in any degree, with the possible exception of the testimony of one witness which seemed to suggest that one of the subscribing witnesses was not in the room at the time the testator signed the will, but was subsequently called in. The evidence in full leaves no such uncertainty, and, if it did, it would not affect the question, for the statute requires that "such subscription shall be made by the testator, in the presence of each of the attesting witnesses, or shall be acknowledged by him, to have been so made, to each of the attesting witnesses." Rev. St. (9th Ed.; Banks Bros.) p. 1877, § 40, subd. 2. The evidence shows that the signature was made and acknowledged in the presence of each of the witnesses. Each of these witnesses testifies without objection that the testator was of sound and disposing mind at the time, and, 'as every man is presumed to be of sane mind until the contrary is shown, the burden of proving unsoundness or imbecility of mind in the testator is upon the party impeaching the validity of the will for that cause. The attesting witnesses to a will are regarded in the law as placed around the testator in order that no fraud may be practiced upon him in the execution of the will, and to ascertain and judge of his capacity. On this ground these witnesses are permitted to testify as to the opinion they formed of the testator's capacity at the time of executing his will; and their opinions, and the facts they state as occurring at the time, are generally to be particularly regarded by the court. 1 Jarman on Wills (2d Am. Ed.) 72, 74.

The only possible dispute as to the testator's capacity to make a will on the date of the execution of the paper offered for probate was the testimony of one of· the doctors at the Sancy Hospital, where the testator had been taken for an operation for appendicitis. This doctor, who did not recollect to have seen the patient on the day of the date of the will, testified from a chart supposed to show the patient's temperature, respiration, etc., at various times during the day, and, after explaining what the chart showed, and the characteristics of the patient's difficulty, he was asked: "What, in your opinion, would be the effect on this man's mind of somebody bothering him persistently about some object?" There was absolutely no evidence in the case that any one had been bothering the patient about any subject. The most that had appeared

was that this same witness had testified that the patient's relatives had been very persistent in visiting him; that they had come in at times contrary to the rules of the hospital; but upon cross-examination he admitted that he knew nothing of this personally, his statement being based upon statements made to him by some nurse or attendant, who was not called in the case. But, so far as appears from the evidence, these relatives were not bothering him or importuning him, and there is absolutely no evidence that any of the beneficiaries were present at the hospital in violation of the rules, or that any one of them ever made any suggestions in reference to the disposition of his property, or with reference to any matters of business. The most that can be said, even from the hearsay evidence of the doctor, is that the testator's relatives visited him at the hospital. Not one word is said to indicate that any one of the beneficiaries ever said a word in the hospital to him. The proponent objected to the question above without stating any ground, and the objection was overruled, and an exception was taken. The witness answered: "I should think that the effect, under his condition, would be to get rid of them as soon as possible." This same witness, after telling of what was probably done in preparing the patient for the operation which was to take place on the day following the date of the execution of the will, was asked: "What, in your opinion, is the effect of this on the patient as to his nervousness and irritability?" This was objected to on the grounds that no foundation had been laid; that the witness was not qualified. The objection was overruled, and after an exception the witness answered: "It increases their nervousness and apprehension. Aside from their physical discomfort, it is a sign of the approaching operation, and that, of course, induces an increased nervousness; that is what I mean." The witness was then asked: "Was this man, Samuel Nelson, at or about two o'clock p. m. on the 21st day of June, 1903, in a mental condition which would enable him to sustain a continuous effort for about three-quarters of an hour such as would be involved in the drawing of a will?" This was objected to unless the doctor could state that he saw the patient on that day. The objection was overruled, and the proponent excepted. The witness answered: "From his condition, as I followed it very closely for a number of days, I should think that his condition would not warrant such an act. Your honor understands that I am not an expert. I have not qualified as such." The surrogate suggested that the witness intended to say that he had not qualified as a mental expert, and was answered in the affirmative. The witness was then asked, "I ask for your opinion as a physician," and the witness responded, "Then I should answer, 'No.'" A motion to strike this out was denied. On cross-examination the witness said, "I do not wish to say, judging from the man's condition, that he was incapable mentally of making a will." This is the extent of the evidence which in any manner bears upon the testator's mental condition at the time of executing the will, and it goes only to the extent of the opinion of a physician who had seen him on Friday that on the

following Sunday, judging from a chart, which is not shown to
have been accurately kept, the patient was not in a condition to
undergo a "continuous effort for about three-quarters of an hour·
such as would be involved in the drawing of a will"; this opinion
being, not as an expert in mental diseases, but as a physician, and
the witness specially disclaims an intention to pass upon his men-
tal capacity to make a will. The evidence in the case did not show
that the testator was called upon to undergo any continuous effort
for three-quarters of an hour. It was in evidence that Charles
Bavetta, the notary public who drew the will, was in the room
about three-quarters of an hour, but the contents of the will are
such that it.might have been stated in all its details in less than
five minutes. The will itself bears evidence of a sound mind. It
disposes, concededly, of all of the testator's property—of his money
in a savings bank, of. his store and its contents, and of a life in-
surance policy. It provides for all of his brothers and sisters, so far
as appears, giving each one a portion. It imposes an obliga-
tion on his brother to pay over to one of his sisters $100, the amount
to his credit in the bank not being sufficient to pay the·other be-
quests and make provision for this one, and he gives his wife
an insurance policy of $1,000. It closes up his worldly affairs in
a manner which we, not knowing all of the circumstances, have
no right to criticise, and which may have been in accord with the
highest principles of justice. The evidence in support of the will
is absolutely without dispute. There is not only no evidence to
overcome the presumption in favor of the validity of the will, but
there is affirmative evidence to show that the will was executed in
conformity with the provisions of the law, and by a person men-
tally capable of making a will. The case, then, is one where the
testator had testamentary capacity, a present knowledge of the·
contents of the will, and where at its execution he was surrounded
by all the guards which the statute has prescribed to prevent fraud
and imposition. A will executed under these circumstances can
be avoided only by influence amounting to force or coercion, and
proof that it was obtained by this coercion. The burden of prov-
ing it is upon the party who makes the allegation. Matter of Will
of Martin, 98 N. Y. 193, 196, 197, and authorities there cited; Mat-
ter of Mondorf, 110 N. Y. 450, 456, 18 N., E. 256. In this case
there is absolutely no evidence of what the law, or common un-
derstanding, would term undue influence. There is no evidence
that any individual ever made any suggestion to the testator as
to the contents of this will, or of his disposition. of his property.
The will, according to the testimony of Charles Bavetta, who drew
it, was dictated in all its provisions by the testator, and there is
no evidence that Mr. Bavetta had any interest in the matter, or
that he was not an honest man, or that there was anything about
his employment which was irregular or questionable. He was a
notary public, a dealer in real estate, had previously drawn wills,
and the testator called him in to perform the offices of a scrivener
in disposing of his small estate. What is there about this will or
the manner of its execution—what is there in the will itself—to·

suggest anything except the act of a rational man, free from coercive influences? We confess that we are unable to share in the doubts and misgivings which appear to have troubled the learned surrogate. There was no fraud, imposition, constraint, or coercion (Matter of Mondorf, supra), so far as the evidence discloses, and fraud and undue influence are not to be presumed, but must be proven by the party relying upon such allegations (Matter of Will of Martin, supra).

The decree should be reversed, and the issues presented to a jury for trial. All concur.