In the Matter of the Probate of the Last Will and Testament
of WESLEY HALL, Deceased.

FRANK HALL and GEORGE D. HALL, Contestants, Appellants;
CHARLES B. KERWOOD, Respondent.

Third Department, September 8, 1920.

**Wills — probate — evidence not establishing undue influence —
direction of verdict — jury trial in Surrogate's Court — waiver by
intervening contestant of objection based on failure to draw jury
in his presence.**

Appeal from a decree of the Surrogate's Court entered upon a directed
verdict of a jury admitting a will to probate. The testator left his residu-
ary estate to a person who, although never formally adopted, had lived
as a member of the testator's family for twenty years. The contestant,
who had been the beneficiary under former wills, had also lived with the
testator who before drawing his last will had deeded lands to the contestant
taking back a note and mortgage. Shortly before his death the testator
left the house of the contestant and went to live with the person whom he
made residuary legatee. Probate is contested solely upon the ground of
undue influence. Evidence examined, and *held*, wholly insufficient to
support any charge of undue influence; that it was proper for the sur-
rogate to direct a verdict for the proponent and that the decree should be
affirmed.

Where the contestant intervened in the proceeding after a jury had been
impaneled and on his petition a citation was issued to the next of kin
and the proceeding adjourned without objection on his part to the jury,
there was a waiver of any right to have a new jury drawn in his presence.

In any event, as the surrogate properly took the case from the jury, it is
entirely immaterial whether the jury was properly impaneled, for there was
nothing to submit to it.

KILEY and H. T. KELLOGG, JJ., dissent, with memorandum.

APPEAL by the contestants, Frank Hall and another, from
a decree of the Surrogate's Court of the county of Saratoga,
entered in the office of said surrogate on the 3d day of Novem-
ber, 1919, upon the verdict of a jury directed by the court,
admitting to probate the last will and testament of Wesley
Hall, deceased.

*Edward S. Coons [George H. Stenacher* of counsel], for the
appellant Frank Hall.

*Mc Kelvey & Stenacher* [*George H. Stenacher* of counsel], for the appellant George D. Hall.

*Leary & Fullerton* [*Walter A. Fullerton* of counsel], for the respondent.

WOODWARD, J.:

A fair statement of the facts in this case which are supported by evidence rather than the assertion of counsel leads irresistibly to the affirmance of the decree of the surrogate.

Wesley Hall and his wife never had any children of their own. Laura Kerwood, the residuary legatee under the will which has been probated, was taken into the Hall family when about three years of age. There appears to have been some pretense at adoption, but the proceeding was informal and whatever papers were executed were destroyed by Mrs. Hall before her death in 1917. Mrs. Kerwood was known as Laura Hall and lived with the family until her marriage, and for a period of twenty years. Frank Hall, one of the contestants, in his petition to intervene on the ground that he was the legatee under former wills, says that he " was apprenticed to said Wesley Hall by the superintendent of the poor of Saratoga county on or about the month of December, 1885, at which time he was less than one year of age, and was reared by and resided with said Wesley Hall and his wife, Helen Hall, continuously, until the death of said Helen Hall on or about the 14th of December, 1917. That shortly after her death your petitioner was married, and the said Wesley Hall made his home with petitioner and his wife until on or about October 20th, 1918." The premises occupied by the Hall family consisted of two parcels operated as one farm. Helen Hall appears to have had some differences with Mrs. Kerwood and some time before her death deeded her portion of the farm to the contestant Frank Hall, who was not related to her in any way, as Mrs. Kerwood was not. Subsequent to the death of Helen Hall, and while Wesley Hall was living in the home of Frank Hall, Wesley Hall deeded his portion of the farm to Frank Hall, the latter giving back a purchase-money mortgage for $1,500, and Frank Hall and his wife giving a joint note for $3,000, making the consideration for the farm, including some

personal property, $4,500; and it is claimed, and this is perhaps supported by slight evidence, that Wesley Hall did not intend that either of these obligations was to be paid. Indeed, at the time this deed was made there were two wills of the said Wesley Hall in which Frank Hall was named as the ultimate owner of the estate of Wesley Hall. But Wesley Hall appears to have been a prudent man and he took the obligations of this foster son and his wife as he suggested for the purpose of protecting himself if anything happened to Frank Hall. It was specially urged by the appellant that there was an agreement that the mortgage for $1,500 was not to be recorded, but it appears from the appellant's brief that the mortgage was, in fact, recorded in the office of the county clerk of Saratoga county on the 14th day of October, 1918, six days before the testator, for reasons wholly unexplained, left the home of Frank Hall and went to live in the home of Mrs. Kerwood. The appellant asserts in various ways that the testator was kidnapped; that he was not permitted to go back to the home of the appellant; but there is absolutely no evidence to support this assertion. On the contrary, it appears affirmatively that the testator went alone to the office of his former attorney, paid a small bill for past services, took a receipt in full to date, asked for and received the two previous wills which had been left with such attorney, and went to the office of another attorney and asked to have his will drawn; that this attorney took memoranda of the matters desired to be included in the will and subsequently wrote it out; that the testator came back into the office, picked out his own witnesses and executed the will in conformity to all the requirements of the Decedent Estate Law (§ 21), and was declared by his witnesses to be in sound mind and competent to discharge the duties of a testator. Of course it was prudent for the testator to record this mortgage in any event; it was necessary to his protection. What fact or facts existed to call for the recording of this mortgage at this particular time are not disclosed; naturally would not be by the appellant, and the proponent relied upon a motion for a direction by the court, on the theory that no case had been presented. It is certainly in accord with reason, and requires no presumption of crime, to take the view that the testator had for some reason concluded that he was not safe with the unrecorded mortgage.

When the mortgage was recorded it was notice to the world that the testator intended to rely upon his legal rights, and it is highly probable that either the knowledge of this recording, or the circumstances which induced its recording, operated as the moving cause of the change of home made by the testator on the twentieth of October, six days later. To assert that there was any element of kidnapping in Wesley Hall's going to the home of his foster daughter in the manner described by the appellant's witnesses is an abuse of language and illy calculated to give character to an appeal. It is highly probable from the testimony that Wesley Hall thought well of Frank Hall; that in the early stages of his residence with the latter and his wife he received proper treatment; that at the time of making the deed and accepting the obligations it was understood that the testator was to make his home with Frank and that, there being no need for the money, the debt should remain uncollected to be extinguished by the then existing wills. It is not contended that there was such a contract; merely that this was the intention of the testator toward his foster son, and the theory of the contestant is, not that the testator was mentally incompetent, or that the will of January 9, 1919, under which Mrs. Kerwood became the principal legatee, was not executed with all the forms of law, but that there was undue influence exercised upon the testator to induce him to change his will. This was the only question the contestant asked to have submitted to the jury, and it is the one question as to which it may be confidently asserted there was no evidence whatever.

The evidence which was furnished by the contestants indicated that there had been an estrangement between Wesley Hall and Mrs. Kerwood. Apparently this was more particularly with Mrs. Hall, shared in some measure by the husband. There was evidence that Wesley Hall spoke well of Frank Hall and of his wife in the summer of 1918, and that in October of that year the testator, who had been living with Frank Hall, went to live with Mrs. Kerwood. Emma Hall, Frank Hall's wife, testifies as to this alleged kidnapping that " on Wednesday he [testator] was out in the yard and Charles Kerwood [Mrs. Kerwood's husband] came by; he got in with him. This was in the morning, * * * and then he came back that after-

noon and spoke about they wanted him to come there and stay with them; that Mrs. Kerwood wanted him to come up there and stay." Obviously, up to this point there was no kidnapping. The next day the testator left the home of Frank Hall, and Mrs. Frank Hall continues that at that time she and her husband were in the orchard near the house picking apples; that " Mrs. Grundy and a girl they had working for them,   *   *   * drove up. I saw the rig stop at our house, and Wesley Hall came out of the house and got in the wagon. But we didn't know he was going; he had not said he was going."

This is the strongest testimony adduced in support of the assertion of counsel that this testator was kidnapped. The positive testimony of the witnesses is that the testator was a vigorous man of seventy-five to seventy-seven years of age, one witness expressing a vague guess that he was eighty-two. A wagon in charge of a woman and a girl drives up to the Hall house in broad daylight, with both of the Halls within calling distance, and this vigorous old man, in the possession of all his faculties, comes out of the house and gets into the wagon and goes away, and this is called kidnapping. Counsel, after quoting this testimony, adds: " From that day until he died the testator stayed at the Kerwood farm," although the undisputed evidence is that he was at various places unattended by any one during the months that he lived at the Kerwood home, and not a syllable of evidence is adduced that Mrs. Kerwood or any one in her behalf ever made a suggestion as to what the testator should do with his property. We are asked to hold, however, that the surrogate erred; that it was his duty to permit the jury upon this kind of evidence to guess that he was improperly influenced in the making of his will. Mrs. Kerwood, if she had been an entire stranger, might have induced Wesley Hall to come to her home to live without violating any rule of law with which we are familiar. She might, as a stranger, have suggested any claims to his bounty which might occur to her without any legal transgression. It is only when the suggestion is made under circumstances which in law are deemed to operate as a suppression of the judgment or desires of the testator, and to substitute those of the person exercising the power, that there is that undue influence or fraud which the courts condemn, and nothing of the kind is pointed out in

the evidence in this case. The testator was so clearly competent to manage his own affairs that the contestants did not suggest that there was any question for the jury upon this point. There was no legal objection to a reconciliation between Mrs. Kerwood and the testator, who had occupied the relation of a father to her for many years. The testator was called for by the husband of Mrs. Kerwood, whether by appointment or not does not appear; he went to the Kerwood home in the morning and returned in the afternoon, and the next day he was called for by two women and came out of the house and went away. There is not the slightest evidence that he was confined to the home of the Kerwoods, or that any one ever attempted to regulate his goings or comings, or the disposition of his property. He transacted methodically all the business in connection with the retiring of the previous wills and the making of the one in controversy without assistance from any one outside of a thoroughly reputable lawyer of his own choosing, and until the law as we now understand it has given place to a new standard of dealing with the estates of deceased persons the ruling of the surrogate, refusing to permit the jury to guess upon the question of fraudulent influence, must stand. " It is true," say the court in *Matter of Ruef* (180 App. Div. 203, 204), " that the evidence is consistent with the hypothesis that the chief beneficiary induced the will by undue influence; but it does not support such inference, for the evidence is not inconsistent with the assumption that the will expressed the testator's own voluntary intent. An inference of undue influence cannot be reasonably drawn from circumstances when they are not inconsistent with a contrary inference," and, quoting from an English case, it is said that " ' it must have been shown that such coercion, duress or domination was exercised over the very testamentary act itself.' " Continuing, the court, after pointing out on high authority that the burden of proof of undue influence in a will contest rests on the contestant and does not shift, says: " In order to avoid a will on the ground of undue influence, ' it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity, which could not be resisted, constrained the testator to do that which was against

his free will and desire, but which he was unable to refuse or too weak to resist.'" In the case cited the testator was comparatively helpless, addicted to the use of liquor, blind and much enfeebled, but the court sustained the surrogate in directing a verdict upon the question of undue influence, and that must be the determination in this case. (See *Matter of Nelson*, 97 App. Div. 212, 217, and authorities there cited.) The mere fact that a vigorous man of eighty years of age, more or less, lives in the family of his foster daughter and makes her the chief beneficiary of his will, contrary to a previously expressed purpose, does not give rise to an issue of undue influence, and the surrogate was clearly right in his disposition of the case.

August nineteenth George D. Hall appeared in this proceeding and filed his petition. He thus became a party to this proceeding. The jury was then present. On his petition a citation was issued to next of kin, and the proceeding adjourned. He made no objection to the jury or to their being brought back. Had he objected that jury could have been discharged and a new jury drawn in his presence. This constituted a waiver.

The surrogate having taken the case from the jury, it is entirely immaterial whether the jury was properly impaneled or not, there being nothing to submit to it.

The decree of the surrogate should be affirmed, with costs.

All concur, except KILEY, J., dissenting, with a memorandum in which H. T. KELLOGG, J., concurs.

KILEY, J. (dissenting):

I dissent upon the ground that the filing of a new petition and asking for a jury upon his initiative was a new proceeding. George D. Hall had no notice of the drawing of a jury as provided under section 2540 of the Code of Civil Procedure. He could not be forced to trial before a jury drawn in another proceeding; he never had any notice as provided under section 2540 of the Code of Civil Procedure, and no order was made as required by sections 2538 and 2540 of the Code by the surrogate in his proceeding.

H. T. KELLOGG, J., concurs.

Decree affirmed, with costs.